UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

J. IRVIN BEATLEY,
    Plaintiff,

v.                                                 Civil Action No. 3:18-cv-37-JAG

CHARLES E. AYERS, JR., et al.,
    Defendants.

## OPINION

In this case, the plaintiff has sued three former business colleagues for breach of contract, conspiracy to breach a contract, fraud, and conspiracy to commit fraud. The Court finds that the defendants breached their contract with the plaintiff, and awards damages, jointly and severally against each defendant, in the amount of $157,195. In addition, the Court finds that one defendant, Charles E. Ayers, Jr., committed fraud, resulting in damages to the plaintiff in the amount of $157,195. The Court also awards punitive damages against Ayers in the amount of $25,000. The Court finds for the defendants on the other claims. The following Opinion states the reasons for the Court's decision.

## I. FACTS

### A. The Parties

This case arises from an unsuccessful attempt to create a waterfront project called Anchor Point in Hopewell, Virginia. The plaintiff, J. Irvin Beatley, teamed up with the defendants, Charles E. Ayers, Jr., Ralph L. Costen, Jr., and Jesse L. Barber, to develop a community with condominiums, single-family homes, a marina, and other facilities along the Appomattox River. A fifth person, John Woodfin, Sr., also took part in the project, apparently primarily as a financial backer. Woodfin died before this case began. His son, John Woodfin, Jr., took over his

role in the project. For ease of identification in this Opinion, the Court will refer to the Woodfins as Woodfin Sr. and Woodfin Jr. Neither Woodfin is a party to this case.

The parties presented almost all their evidence in documentary form. Plaintiff Beatley has suffered a stroke that renders him unable to testify. Defendant Barber did not testify or even appear. Defendant Costen testified by deposition; he did not show up at trial. Defendant Ayers appeared in person and testified. The Court observed Ayers' testimony, and found him largely incredible. In fact, his business partner, Costen, testified that Ayers has a bad reputation for truthfulness in the community.

The Court does not have an official copy of the transcript of the trial, but has a rough copy of the transcript upon which it has relied to supplement its memory of the incidents of trial.

### B. The Anchor Point Development

Anchor Point never got off the ground, and it lost a great deal of money—much of which the parties had borrowed. Not surprisingly, the developers wound up fighting each other in a lawsuit. Beatley sued Ayers, Costen, and Barber in the Circuit Court of the City of Richmond. In state court, Beatley alleged that he had put millions of his own dollars into Anchor Point, that he had borrowed a great deal of additional money for the project, and that Ayers, Costen, and Barber had agreed to shoulder a proportionate share of the financing. Beatley claimed that the defendants did not pay their share and left him holding the bag. (Pl.'s Ex. 2.)

The state court litigation resulted in a settlement that would allow Beatley to recoup part of his loss from his colleagues. Unfortunately, history repeated itself: Beatley's co-developers did not perform the settlement as agreed, leading to this litigation.

## C. Anchor Point's Financing

Before discussing the settlement agreement and the defendants' performance, the Court must describe the outstanding debt from the project. The outstanding loans are important in this case because the defendants say that they figured in their performance of the settlement agreement.

The financing of Anchor Point was complicated and confusing. Of the myriad loans related to Anchor Point, two are especially important to this case. Both came from Resource Bank, which later became Fulton Bank. First, Beatley, Ayers, Costen, and Barber each personally signed notes to get loans of $157,195 to help finance the project. (Pl.'s Ex. 21.) Woodfin Sr. guaranteed the loans. (Pl.'s Ex. 39.) Woodfin Sr. also posted a certificate of deposit as collateral to cover all four $157,195 notes. Ayers falsely testified that he did not know about Woodfin's collateral. At trial, Ayers testified, "I didn't know at the time that John Woodfin had made a deposit at the bank which facilitated [the $157,195 loans]." (Trial Tr. 120:9-12.) A June 29, 2017, letter to Fulton Bank, however, shows that Ayers' testimony is false. In the letter, Ayers said, "I realize that the Woodfins have provided collateral for [the $157,195] loan." (Pl.'s Ex. 8.) The collateral later proved important to the defendants' defense of this case.

In the second important loan, MPD Ventures, LLC,[1] borrowed approximately $1.8 million dollars for the project. The parties and Woodfin Sr. guaranteed the MPD loan. Apparently the MPD loan went into default, or was called by the Bank for other reasons. The Woodfins stepped in and bought the MPD loan through a company they owned called Grove &

---

[1] MPD Ventures is a corporation created by the developers related in some way to the Anchor Point project.

Libbie Service Co. LLC. At the times relevant to this suit, Grove & Libbie held the MPD loan, with a balance of $885,522,57. (Pl.'s Ex. 35.)

### D. *The Settlement Agreement for the State Suit*

In the state court litigation, Beatley wanted to recover as damages the money that Ayers, Costen, and Barber should have paid to carry their share of the financing. On June 16, 2017, the parties mediated the case. All four parties to this case attended the mediation. So did Kevin Walsh, a representative of the Woodfins' interests. By the time of the mediation, Woodfin Sr. had died, and Woodfin Jr. served as administrator of his estate. Although the Woodfins were not parties to the state court litigation, Woodfin Jr. sent Walsh to the mediation. Walsh serves as a financial monitor or advisor of Woodfin Jr.'s many business affairs. Although he attended the mediation, he did not sign the settlement agreement.

The settlement agreement contained two provisions pertinent to this litigation. They state as follows:

> 2. Defendants [Ayers, Costen, and Barber] shall pay plaintiff [Beatley] $134,000 on or before July 17, 2017.
>
> 3. Defendants agree to assume all of plaintiff's obligations on the loan from Fulton Bank to plaintiff in the original principal amount of $157,000. Defendants agree to use all best efforts to obtain Fulton Bank's consent to their assumption of the loan and the release of plaintiff from all obligations relating to the laon. Defendants further agree that their responsibility under this paragraph includes the payment of the monthly interest charge due on or about July 1, 2017.

The agreement also provided that Beatley would release a deed of trust he held on the planned site of planned condominiums. (Pl.'s Ex. 3.)

In sum, the agreement would result in a cash payment of $134,000 to Beatley, due 31 days after the mediation. The defendants would also use their best efforts to get the Bank to release Beatley from his $157,195 loan. The agreement recognizes that the Bank might not

4

agree to take Beatley off the note, so it also provides that the defendants would pay ongoing interest on the note and would eventually assume Beatley's duty to pay the note off.

### *E. Performance of the Settlement Agreement*

The defendants did not perform the settlement as agreed. They did not pay $134,000 on time. They used, at best, minimal efforts to get the Bank to release Beatley from the $157,195 note. They did not pay the $157,195 note when due. But they offer a number of excuses for their failure to perform.

#### *1. Payment of $134,000*

Almost immediately after signing the settlement agreement, Ayers took the lead in the defendants' attempts to get out of the deal. His efforts to evade making the $134,000 payment illuminate his intent to perform the entire agreement.

Ayers tried to use Woodfin Jr. to put pressure on Beatley so that the defendants would not have to make the $134,000 payment due on July 17, 2017. Three business days after the settlement, Ayers emailed Woodfin Jr. to tell him that, as part of the settlement, "[w]e did get the release of [Beatley's] deed of trust on the condominium." (Pl. Ex. 6.) As to the rest of the settlement, Ayers told the vacationing Woodfin Jr., "I have a strategy and we can discuss it when you get back." (*Id.*)

After Woodfin Jr. returned from his vacation, Ayers tried to implement his "strategy." On Wednesday, July 12, 2017, Ayers emailed Woodfin Jr. to ask him to have Kevin Walsh contact Beatley's lawyer and demand $100,000 of the $134,000 due in a matter of days. Ayers asked Woodfin Jr. to "pursue that vigorously because Friday will be here before you know it." (Pl.'s Ex. 9.) Friday was the last business day before the due date of the $134,000 payment. Costen

knew about Ayers' scheme, as demonstrated by his email to Ayers on July 13 asking whether he had heard from Woodfin Jr. *Id.*

July 17 came, and the defendants did not pay the money. On August 1, Ayers again tried to get Woodfin Jr. to turn up the heat on Beatley. Ayers said in an email,[2] "I really need to talk to you about Irv Beatley and put together some plan to finalize that settlement." (Pl.'s Ex. 12.) By using the words "finalize that settlement," Ayers could only have meant to get out of paying the money to Beatley: the agreement was already in final form, and nothing remained except the defendants' performance. Ayers ratcheted up his efforts to get Woodfin Jr. to pressure Beatley to give up trying to collect the money. Ayers offered to write a demand letter to Beatley for Woodfin Jr.'s signature. As an incentive for Woodfin to sign the letter, Ayers said Beatley would otherwise "get the money" and "do something with it before you can get to it." (*Id.*) Whatever his motives toward Woodfin Jr., Ayers clearly did not want Beatley to get the money due to him.

Eventually, Ayers got Woodfin Jr. to move, albeit in halting and inconsistent steps. On August 4, 2017, Woodfin Jr. wrote to Beatley ostensibly on behalf of Grove & Libbie, the Woodfin-controlled company that now held the MPD loan guaranteed by Beatley, Woodfin Sr., and all three defendants. Grove & Libbie demanded payment of $100,000 from the money in the mediation—the precise amount suggested by Ayers in his July 12 email. (Pl.'s Ex. 15.)

Then, on August 17, 2017, Woodfin Jr. sent a second demand letter on behalf of Grove & Libbie. This second letter went to Beatley, Ayers, Costen, and Barber, and demanded that they pay the entire MPD note. Specifically related to the $134,000, however, the letter said any amount to be paid through the mediation should go immediately to Grove & Libbie. Of course,

---

[2] Ayers sent a copy of the email to Costen.

6

the only amount due through the mediation was the $134,000 due to Beatley. (Pl.'s Ex. 17.) Ayers, Costen, and Barber never replied to the August 14 demand, and never paid any money to Grove & Libbie. From these facts, the Court concludes that the two demand letters existed only as a way to dissuade Beatley from pursuing the money from the defendants.

At around this time, what Ayers considered a fortuitous event occurred. Beatley's lawyer left his firm and went out on his own. Beatley's former firm sent the defendants' lawyer a notice of attorneys' fees lien for unpaid fees and costs. (Pl.'s Ex. 14.) The defendants' lawyer referred to the lien in a status conference held to discuss the defendants' failure to pay the settlement amount. The lawyer claimed that the assertion of the lien played a role in the failure to pay the $134,000 because it caused "confusion" among the defendants. (Pl.'s Ex. 13, at 5.) Unfortunately for the defendants, their "confusion" could not have existed at the time payment was due, because the letter asserting the lien did not go out until a month after the due date.

Although the defendants said in the status conference that they intended to pay the $134,000, (Pl.'s Ex.13, at 11), nothing happened.

On August 25, 2017, Ayers tried a new tactic to get Woodfin Jr. to move more aggressively against Beatley. First, Ayers said that a letter from Fulton Bank needed to go out. This apparently referred to a demand from Fulton to pay the $157,195 notes. Somehow, Ayers seems to have believed that Woodfin could get the Bank to demand payment. (Pl.'s Ex. 18.) It took a while, but on February 9, 2018, the Bank finally did demand payment. (Pl.'s Ex. 21.)

More importantly, Ayers came up with a plan to get Barber and Costen out of the project, leaving Ayers and Woodfin Jr. as the sole principals. Ayers said that Barber would drop out of the project if Fulton Bank would forgive the $157,195 note, and if Barber could get out of paying for two lots on the project. With respect to Costen, Ayers said that Costen would give up his

7

position if Woodfin Jr. would take over the loans from Fulton Bank and accept $100,000 of the $134,000 due to Beatley. (Pl.'s Ex. 18.)

Then, "shifting to Irv Beatley," Ayers begged Woodfin Jr. to sue Beatley. (*Id.*) He suggested that Woodfin Jr. might even have a confession of judgment note against Beatley. (*Id.*) This bait, however, did not persuade Woodfin Jr. to file suit against Beatley.

Finally, in January, 2018, Beatley got tired of waiting for his money and filed suit in this Court.[3] Among other things, Beatley sought payment of the $134,000. The new suit prompted Ayers to greater efforts to get Woodfin Jr. to put pressure on Beatley. On February 7, 2018, Ayers told Woodfin either to file suit against Beatley or at least to send a strong demand letter.[4] (Pl.'s Ex. 20.)

Woodfin Jr. did not move as fast as Ayers wanted. On February 23, 2018, Beatley moved for partial judgment on the pleadings, because the defendants had not denied that they owed the $134,000. On February 26, Ayers wrote a desperate email to Woodfin Jr. saying that "it has become almost an emergency that you move forward quickly" with suing Beatley. Ayers treated it as a fait accompli that they could get Costen and Barber out of the project. He assured Woodfin Jr. that Ayers could generate a million dollars gross profit from Anchor Point, which would all go to Woodfin Jr. But, Ayers said, he could not handle the pressure from Beatley and perform at the same time.[5] (Pl.'s Ex. 29.)

Woodfin Jr. brought attorney Christopher Habenicht into the picture. Ayers sent Habenicht an email asking him to get an extension of time to respond to the motion for judgment

---

[3] Beatley now lives in South Carolina, so the Court has diversity jurisdiction.
[4] Ayers offered to set Woodfin up with a "competent" but "inexpensive" attorney to handle the matter.
[5] Apparently, at this time Fulton Bank had also begun seeking payment of the various notes. This pressure contributed to Ayers' inability to "perform" in turning Anchor Point into a money maker. (Pl.'s Ex. 21.)

on the pleadings. This made no sense, because Habenicht's clients, Woodfin Jr. and his corporation, were not parties to this case, and Habenicht had not entered an appearance for anyone. In his email, Ayers represented to Habenicht that it would be "counterproductive to file an answer [to the motion] and state that we haven't paid the money because $100,000 was supposed to go to [Woodfin Jr.] and $34,000 to [Beatley's lawyer's] old firm that has filed a lien." (Pl.'s Ex. 31.) Ayers' representation about where the money "was supposed to go" is completely false.

On March 29, 2018, Habenicht wrote another demand letter on behalf of Grove & Libbie. He demanded that Beatley, the defendants, and the Estate of Woodfin Sr., as guarantors, pay the MPD loan, which Grove & Libbie now held. (Pl.'s Ex. 35.) None of the defendants responded to the letter; nothing came of the demand.

On April 13, 2018, facing certain judgment on the pleadings, the defendants paid the $134,000, plus interest.[6]

## 2. Relief from Payment of $157,195 Loan

In addition to the payment of $134,000, the settlement agreement called for the parties to relieve Beatley of his obligations under the $157,195 loan from Fulton Bank.

This portion of the agreement contained two basic obligations. First, the defendants had a duty to use their "best efforts" to have the Bank release Beatley from the note, and substitute them in his stead. Second, recognizing that the Bank might not release Beatley, the defendants had a duty to satisfy Beatley's financial obligations under the loan. This duty had two subparts: (a) the defendants would pay interest as it became due, and (b) they would pay off the loan when it became due. (Pl.'s Ex. 2.)

---

[6] A portion of the payment went to Beatley's former law firm to satisfy the attorneys' fees lien.

### a. Best Efforts to Obtain Release from Note

Immediately after the mediation, Beatley authorized Fulton Bank to discuss assumption of the loan with Ayers. (Pl.'s Ex. 5.) On June 29, 2017, Ayers wrote to the Bank asking for paperwork for him and Costen to take over the loan. (Pl.'s Ex. 8.) Ayers' letter indicated that the loan assumption formed part of a larger process in which Beatley would no longer participate in any aspect of Anchor Point. The evidence does not show that any such agreement existed—the defendants were simply supposed to get Beatley off the note.

At some point, Ayers also called a Bank officer. His phone call went into voice mail, and Ayers never heard back from the Bank.

Ayers made no other efforts to relieve Beatley of his obligations under the $157,195 note. He did not follow up on either the letter or the phone call.

Neither Costen nor Barber made any efforts to relieve Beatley from his obligations to Fulton Bank.

### b. Payment of Obligations as They Came Due

The defendants made interest payments on the Fulton Bank loan, but they typically made the payments late. Almost all the loan statements show a past due amount. (Def,'s Ex. 14; Pl.'s Ex 48.)

On February 9, 2018, Fulton Bank demanded payment of the $157,195 note. On February 14, the defendants' lawyer acknowledged their duty to pay the note. (Pl.'s Ex. 16.) Specifically, he said that "they still had an obligation to make the payments . . . eventually principal payments if there is a balloon payment." The defendants did not pay the note, even after the Bank called it. Instead, in May, 2018, the Bank took the collateral posted by Woodfin Sr. and applied it to the notes.

### F. Status of Woodfin Sr.'s Estate and Future of Anchor Point

Woodfin Jr. serves as administrator of his father's estate. He has closed the estate, and has no intention of making any further claims on behalf of the estate.

Woodfin Jr. views Anchor Point as a failed endeavor, and he wants the Woodfin family and businesses to escape the mire of the project. His company, Grove & Libbie, now holds deeds of trust for all the property. Woodfin Jr. intends to foreclose on the deeds of trust, take ownership of the land, and sell it for whatever he can get.

## II. ANALYSIS

Beatley makes four claims against the defendants. First, he asserts a claim for breach of the settlement agreement. Second, he asserts a count of conspiracy to breach the settlement contract. Third, he claims fraud in the inducement by the defendants—that they falsely represented that they intended to perform the settlement, when, in fact, they intended to breach from the start. Finally, Beatley claims conspiracy to commit fraud.

### A. Breach of Contract

To succeed on his claim for breach of contract, Beatley must prove the following elements: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 344, 784 S.E.3d 296, 299 (2016).

The parties entered into an agreement which contained legally enforceable obligations. As settlement of a suit, the defendants agreed to pay $134,000 by June 17, 2017, and to take over Beatley's duties under the $157,195 note to Fulton Bank. The defendants breached those

obligations: they did not pay the $134,000 in time, they made late payments of interest on the $157,195 note, and they did not pay the note when the Bank demanded payment.

The defendants say that Beatley has suffered no damage, and so cannot assert a claim for breach of contract. They are partially correct. They paid the $134,000, with interest. Although late, the payment with interest makes Beatley whole. Beatley agrees that the payment with interest renders the claim for $134,000 moot. Indeed, in a prior Order, the Court deemed this claim moot. (Dk. No. 18.)

The $157,195 note, however, works out differently. The defendants breached the agreement in two ways. First, they did virtually nothing to secure Beatley's release from the Fulton Bank note. The paucity of their efforts to get Beatley off the bank note is apparent when one contrasts them with Ayers' efforts to avoid paying the $134,000 obligation. Ayers spent months concocting plans and cajoling Woodfin Jr. to get Beatley to forego the monety due from the defendants. In contrast, when it came to money Beatley would have to pay on the $157,195 note, Ayers did almost nothing. He (1) sent the Bank a quick letter (that contained false information), to which he received no reply, and (2) made a call that went into voice mail. He never followed up on either effort.

Second, they did not pay off the debt to Fulton Bank. When the Bank called the note, the defendants' lawyer announced their intent to pay it off. Instead, they simply waited until the Bank seized Woodfin Sr.'s collateral.

The defendants argue, again, that Beatley suffered no damages; they say that the Bank's use of Woodfin Sr.'s collateral to pay the loan leaves Beatley whole. This argument, however, ignores Virginia law. When the Bank took Woodfin Sr.'s collateral to satisfy Beatley's debt,

Woodfin Sr. stood in the Bank's shoes and is subrogated to the claim under the note. *See Fed. Land Bank of Balt. v. Joynes*, 179 Va. 394, 401, 18 S.E.2d 917, 920 (1942).

An estate's representative "ha[s] not only the authority, but most likely even the duty, to file suit to collect debts owed to the decedent's estate." *See Campbell v. Harmon*, 271 Va. 590, 600, 628 S.E.2d 308, 313 (2006); *see also Isbell v. Flippen*, 185 Va. 977, 981, 41 S.E.2d 31, 33 (1947) ("[F]ailure to proceed promptly with the collection of assets due the decedent's estate is negligence, for which the personal representative may be liable."). Under Virginia law, therefore, Beatley has shown that he has exposure to Woodfin's estate beyond mere "uncertainties, contingencies, or speculation." *See Shepherd v. Davis*, 265 Va. 108, 125, 574 S.E.2d 504, 524 (2003).

That Woodfin Jr. has "closed" his father's estate makes no difference. An administrator's ability to collect debts to the estate continues after the estate is closed. "[A] fiduciary acting as personal representative of a deceased person's estate is wholly unlike other fiduciaries." *Martirosov v. Shenandoah Flight Servs., Inc.*, 64 Va. Cir. 163 (2004). A discharge of the estate relieves him of "responsibility for the assets" of the estate. *Id.* "However, he is still administrator and still has the right and duty to collect and administer any assets which may be afterwards discovered." *Id.*

In this case, the defendants agreed to "assume plaintiff's obligations on the loan." Beatley's debt to Woodfin Sr.'s estate arises from the loan. The defendants have simply left Beatley on the hook for the same debt, with a successor creditor.

The Court will enter judgment for breach of contract for the amount of $157,195 against all three defendants.

## B. Conspiracy to Breach Contract

"A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Gelber v. Glock*, 293 Va. 497, 533, 800 S.E.2d 800, 820 (2017).

Given Ayer's gyrations to get Woodfin Jr. to intervene, Beatley can argue that Ayers conspired with Woodfin Jr. to breach the obligation to pay the $134,000. But that argument does Beatley no good. As noted above, the defendants ultimately paid the $134,000 note, so he has no damages arising from the $134,000 debt.

Beatley cannot point to any evidence that the defendants conspired with anyone to breach the duty to pay the $157,195 note. The record contains no evidence of an agreement to breach that duty, or even evidence that the defendants discussed it among themselves. The defendants simply did not comply with the contract. While their conduct amounts to a breach, it does not amount to a conspiracy.

The Court finds for the defendants on the claim of conspiracy to breach the contract.

## C. Fraud

The tort of fraud involves the misrepresentation of material facts causing damage to the plaintiff. "A plaintiff asserting an action for actual fraud bears the burden of proving by clear and convincing evidence the following elements: '(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'" *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 557-58, 507 S.E.2d 344, 346 (1998) (quoting *Evaluation Res. Corp. v. Alequin*, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994)).

14

In an appropriate case, a breach of contact can give rise to a fraud claim. The plaintiff must show that, at the time the defendant entered the contract, he had no intention of complying with its terms. "Because fraud must involve a misrepresentation of a present or pre-existing fact, fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding future events." *SuperValu, Inc. v. Johnson*, 276 Va. 356, 367, 666 S.E.2d 335, 342 (2008). "Were the general rule otherwise, every breach of contract could be made the basis of an action in tort for fraud." *Lloyd v. Smith*, 150 Va. 132, 145, 142 S.E. 363, 365 (1928). "Nevertheless, if a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud." *SuperValu, Inc.*, 276 Va. at 368, 666 S.E.2d at 342.

### *1. Fraud by Ayers*

Clear and convincing evidence shows that Ayers never intended to pay money to Beatley. Just a few days after the mediation, Ayers wrote to Woodfin Jr. and said that he had a plan; the plan was to make sure that Beatley got no money. For almost a year, Ayers assiduously lobbied Woodfin Jr. to throw roadblocks to Beatley's recovery. Ayers misstated the terms of the agreement to the Bank and Habenicht.[7] Ayers believed that if Woodfin Jr. put enough pressure on Beatley, no money would change hands and Ayers could keep his portion of the $134,000.

By the same token, Ayers had no intention of relieving Beatley of the obligation to pay $157,195 to the Bank. His "best efforts" to get Beatley off the loan consisted of a brief letter and a voice message, neither of which the Bank responded to. Ayers' efforts to avoid paying the

---

[7] Interestingly, Ayers also came up with a plan to close Costen and Barber out of the project, leaving Woodfin Jr. and Ayers as the only principals. The Court cannot find that Ayers also had this intention at the time the parties entered the contract, and, therefore, cannot find that it is evidence of an existing fact at the time the parties contracted; this latter scheme against Costen and Barber appears more of an idea that arose as opportunity presented itself.

15

$134,000 demonstrate the gymnastics he will undertake to accomplish something that benefits him. Contrasting those efforts with his efforts to get Beatley off the note, it grows clear that Ayers had no intent to perform this obligation under the settlement agreement.

Nor did he intend to pay the note when due. Ayers falsely claimed at trial that he did not know that Woodfin had posted collateral to cover the note. But in an earlier letter to the Bank, Ayers observed that Woodfin had used his assets to collateralize the note. Ayers simply waited for the Bank to call the note and apply Woodfin Sr.'s assets to its payments, leaving Beatley to settle up with Woodfin Sr.'s estate.

A review of the totality of the circumstances shows that Ayers had no intention of performing any obligations under the settlement agreement. He is guilty of fraud. By paying the $134,000 with interest, Ayers avoids paying damages for that amount. But Beatley suffered damages in the amount of the Fulton Bank note, $157,195, a debt which remains unpaid.

The Court will enter judgment against Ayers for fraud, and award damages in the amount of $157,195.[8]

### 2. Fraud by Costen

Because Ayers handled most of the dealings regarding Anchor Point and its sequelae, the Court does not have a smoking gun as to fraud by Costen. Costen admitted in his deposition that he had no intention of paying the $134,000 in a timely fashion, but, as noted above, this cannot form the basis of a fraud recovery because the defendants have paid it in full. Costen also admitted that he did nothing to secure payment of the $157,195 note. But with respect to the note, the evidence shows that Ayers handled most of the work regarding the Anchor Point settlement; it may be that Costen simply relied on Ayers to take care of the note. Either way, the

---

[8] Beatley may not collect $157,195 on both the breach of contract claim and the fraud claim. The damages on both are the same, and he may only collect the $157,195 once.

evidence does not show that Costen intended to breach the obligations respecting the $157,195 note at the time he entered the settlement agreement.

The plaintiff has not shown fraud by clear and convincing evidence against Costen. The Court will enter judgment for Costen on the fraud count.

### 3. Fraud by Barber

The plaintiff has not introduced evidence of fraudulent intent by Barber on entering the settlement agreement. The Court will enter judgment for Barber on the fraud count.

### D. Conspiracy to Commit Fraud

"A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Gelber*, 293 Va. at 533, 800 S.E.2d at 820.

The fraud here consists of a misrepresentation of the defendants' intent to perform that settlement agreement made at the time they entered the agreement. The evidence does not show that, at the time the defendants entered the agreement, they conspired with anyone to misrepresent their then-current intent.

The Court finds for the defendants on the claim of conspiracy to commit fraud.

### E. Punitive Damages

Virginia law allows courts, in their discretion, to award punitive damages to a plaintiff when the plaintiff succeeds on an intentional tort claim. *Shaw v. Titan Corp.*, 255 Va. 535, 545, 498 S.E.2d 696, 701 (1998). "It is well-established that an award of compensatory damages . . . is an indispensable predicate to an award of punitive damages." *Syed v. ZH Techs., Inc.*, 280 Va. 58, 74-75, 694 S.E.2d 625, 634 (2010). "The purpose of punitive damages is to punish the

wrongdoer and warn others." *Flippo v. SCS Assocs. III, LLC*, 262 Va. 48, 58, 547 S.E.2d 216, 222 (2001).

To recover punitive damages, Beatley must show "misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others." *Smith v. Litten*, 256 Va. 573, 578, 507 S.E.2d 77, 80 (1988). "The conclusion that there was misconduct or malice, or that a party acted with a conscious disregard of another's rights need only be a 'possible conclusion' the [fact-finder] could reach." *Id.* (quoting *Jordan v. Sauve & Koons*, 219 Va. 448, 454, 247 S.E.2d 739, 742 (1978)). "Evidence of a party's net worth is admissible because it is material to this purpose and is relevant to a determination of the size of the award and whether it is so large as to be destructive." *Flippo*, 262 Va. at 58, 547 S.E.2d at 222.

Here, the evidence shows conclusively that Ayers committed fraud, that he did so intentionally, and that he did so with absolutely no regard for Beatley's rights. His conduct was planned, and continued over a long period of time. He was motivated by greed, and he conspicuously disregarded Beatley's rights.[9] Essentially, Ayers wanted to get out of a lawsuit, to get Beatley to give up a deed of trust on property, and to pay him not a dime.

Ayers even appears to have acted with malice toward Beatley. At one stage, he even urged Woodfin to turn Beatley into "a history lesson."

In this case, the Court has little choice but to award punitive damages.

Ayers has stipulated that his net worth is more than $10 million. An award of $25,000 in punitive damages amounts to less than one-quarter of one percent of his net worth. This amount is proportionate to the amount awarded in damages—it is slightly less than a sixth of the amount

---

[9] The Court notes in passing that Ayers was also more than willing to cut Costen and Barber out of the Anchor Point project. This is additional evidence that Ayers, throughout the transactions in this case, simply disregarded the rights of anyone other than himself.

18

of Beatley's loss. This amount does not ruin Ayers by any means. Yet, it sends a message to Ayers—and to the public in general—that society, and the courts, will not tolerate this type of misconduct.

The Court awards $25,000 in punitive damages against Ayers.

### F. Attorney's Fees

Virginia law permits parties to recover attorney's fees for wanton or malicious injuries and for fraud. See *Rambus, Inc. v. Infineon Techs. AG*, 164 F. Supp. 2d 743, 761 (E.D. Va. 2001), *rev'd on other grounds*, 318 F.3d 1081 (Fed. Cir. 2003); *Prospect Dev. Co., Inc. v. Bershader*, 258 Va. 75, 92, 515 S.E.2d 291, 301 (1999).

As the Court announced during the trial of this case, it will take up the issue of attorney's fees in a post trial proceeding. Beatley must submit his motion for attorney's fees within twenty-one days of the date of this Opinion.

With his motion for attorney's fees, Beatley must file a memorandum of law supporting his claim. As evidence, he must submit itemized time records, an affidavit establishing their accuracy, and an affidavit from a qualified attorney showing that his hourly rate is reasonable in the Richmond area, that the number of hours spent is reasonable, and that the various tasks performed were reasonable.

### III. CONCLUSION

For the reasons stated in this Opinion, the Court finds for the plaintiff on the breach of contract claim, and will award damages, jointly and severally, against each defendant, in the amount of $157,195. Additionally, the Court finds that Ayers committed fraud, and will award damages in the amount of $157,195. The Court also awards punitive damages against Ayers in the amount of $25,000. The Court, however, will enter judgment for Costen and Barber on the

fraud claim, and for all three defendants on the claims for conspiracy to breach a contract and conspiracy to commit fraud.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 25 June 2019
Richmond, VA

/s/ 
John A. Gibney, Jr.
United States District Judge